UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**ROBERT E. CONNER,**

      **Petitioner,**

**v.**                                                                          **Case No. 8:13-cv-2683-T-27MAP**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

      **Respondent.**

_____/

## ORDER

     Petitioner Robert E. Conner, an inmate in the Florida Department of Corrections proceeding *pro se*, initiated this action by filing a petition for writ of habeas corpus under 28 U.S.C. § 2254 (Dkt. 1) and memorandum in support (Dkt. 2). He challenges his convictions entered by the Circuit Court for the Sixth Judicial Circuit, Pasco County, Florida. Respondent's response (Dkt. 11) raises no challenge to the timeliness of the petition. Petitioner did not file a reply.

### PROCEDURAL HISTORY

     Petitioner's convictions for attempted first degree murder and kidnapping were affirmed on direct appeal. After obtaining postconviction relief, Petitioner was tried a second time. He was again convicted of both charges. (Dkt. 13, Ex. 2, Vol. VII, pp. 1025-26.) Petitioner was sentenced to 25 years in prison for attempted first degree murder, and life in prison for kidnapping. (Id., pp. 1053-59.) He successfully challenged his kidnapping conviction on direct appeal. The state appellate court directed that he be adjudicated guilty of the lesser-included offense of false imprisonment, and that the trial court sentence him accordingly. *Conner v. State*, 19 So.3d 1117

(Fla. 2d DCA 2009). Petitioner was sentenced to a consecutive term of five years in prison for false imprisonment. (Dkt.13, Ex. 5, Vol. III, Final Order Denying Defendant's Motion for Postconviction Relief, Exhibit G, Judgment and Sentence.) Petitioner filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, which the state court summarily denied. (Dkt. 13, Ex. 5, Vol. I, Motion For Postconviction Relief; Dkt. 13, Ex. 5, Vol. III, Order Denying Defendant's Motion For Postconviction Relief In Part; Directing State To Respond In Part; Reserving Ruling In Part; and Final Order Denying Defendant's Motion for Postconviction Relief.) The state appellate court *per curiam* affirmed the order of denial. (Dkt. 13, Ex. 6.)

## FACTS

The facts were summarized as follows in *Conner*, 19 So.3d at 1119:

Mr. Conner was identified as the perpetrator of an attack on a thirteen-year-old girl who was sitting alone at her school bus stop early in the morning. The date of the attack was February 16, 1999. While the victim was waiting for her bus to arrive, she saw a van that had previously passed her return and stop about fifteen feet from the bus stop. The victim testified about what happened next as follows:

The van stopped and I looked over and I saw him open the door and jump out. And I stood up and there was a stocking over his face. And I tried to run and I only got a few feet and he pushed me down. . . . And he pushed me down onto my stomach and I hit my head . . . on the ground next to the road. And he put a stocking around my neck, and he strangled me.

The victim added that her assailant choked her with the stocking so that she was unable to breathe for at least five to six seconds. After a brief period of time,[FN1] the sound of an approaching vehicle with a noisy muffler apparently startled the attacker. He jumped up abruptly, fled to his van while laughing, and drove away.

The van driven by the victim's attacker was seen in the vicinity of schools located relatively near the bus stop both before and after the incident. Information provided by the victim, two other students, and a security officer led to the identification of Mr. Conner as the assailant. After he was arrested and given the *Miranda*[FN2] warnings, Mr. Conner ultimately admitted that he had perpetrated the attack on the victim.

[FN1] At Mr. Conner's second trial, held eight and one-half years after the incident, the victim testified that she was "really not sure how long the whole thing took." When asked at the first trial how long the incident lasted, the victim testified, "About-at the most fifteen, twenty seconds."

[FN2] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Wilcox v. Florida Dep't of Corr.,* 158 F.3d 1209, 1210 (11th Cir. 1998), *cert. denied,* 531 U.S. 840 (2000). Habeas relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d), which sets forth a highly deferential standard for federal court review of a state court adjudication, states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000), the Supreme Court interpreted this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may

issue only if one of the following two conditions is satisfied–the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).  *Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that [the federal court is] to decide.").  The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the case.  "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 693.  In other words, "AEDPA prevents defendants–and federal courts–from using

federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett,* 559 U.S. 766, 779 (2010). *See also Cullen v. Pinholster,* 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . .") (citations omitted).

In a decision without a written opinion, the state appellate court affirmed the rejection of postconviction relief. This decision warrants deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore,* 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied,* 278 F.3d 1245 (2002), *cert. denied sub nom. Wright v. Crosby,* 538 U.S. 906 (2003). *See also Richter,* 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Review of the state court decision is limited to the record that was before the state court. *Pinholster,* 563 U.S. at 180-81.

Petitioner bears the burden of overcoming by clear and convincing evidence a state court factual determination. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### INEFFECTIVE ASSISTANCE OF COUNSEL

Claims of ineffective assistance of counsel are analyzed under the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a petitioner to demonstrate both deficient performance by counsel and resulting prejudice. Demonstrating deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment." *Id.* at 687.   Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690.   However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*   Additionally, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.*

Petitioner must demonstrate that counsel's alleged errors prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691-92.   To show prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Counsel's strategic choices "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.   A petitioner cannot meet his burden merely by showing that counsel's choices were unsuccessful:

> The test has nothing to do with what the best lawyers would have done.   Nor is the test even what most good lawyers would have done.   We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . .   We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992).  *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different.  So, omissions are inevitable.  But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (en banc) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

Sustaining a claim of ineffective assistance of counsel on federal habeas review is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Richter*, 562 U.S. at 105 (citations omitted).  *See also Pinholster*, 563 U.S. at 202 (a petitioner must overcome the "'doubly deferential' standard of *Strickland* and AEDPA.").

If a claim of ineffective assistance of counsel can be resolved through one of the *Strickland* test's two prongs, the other prong need not be considered.  466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998) ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds.").

## DISCUSSION

**Ground One**

Petitioner argues that counsel was ineffective for failing to move to suppress his recorded statements made to Detective Peter Weekes on February 18, 1999.[1]  Petitioner asserts that counsel

---

[1] Prior to Weekes' interview, Sergeant Kerry O'Connor and Deputy Ted Clegg spoke to Petitioner at his home on February 17, 1999.  He consented to a search of his van and home at that time.  Petitioner does not challenge counsel's performance in failing to move to suppress his February 17, 1999 statements to O'Connor and Clegg.

was ineffective for not moving to suppress "both the audio and videotaped statements made by Mr. Conner." (Dkt. 2, p. 10.)

Petitioner made incriminating statements to Weekes, admitting that he made contact with the back of the victim's shoulders and knocked her down. (Dkt. 13, Ex. 5, Vol. III, Final Order Denying Defendant's Motion for Postconviction Relief, Exhibit I, pp. 231, 234, 254.)[2]  However, he denied choking the victim, grabbing her neck, or placing an object around her neck. (Id., pp. 230, 235, 254.) Petitioner stated that he left the scene almost immediately. He explained that "everything happened so fast that day." (Id, p. 250.) Petitioner told Weekes that "I went up there. As soon as I got up there, it was just like, what the hell am I doing, and I left. . . . I swear the second I got to her, I turned - - it was like, what the hell, and I left." (Id., p. 252.) He described that "it was like I came down and like - - it was like made contact and was out of it. I was like freaked out. I was like, this is stupid. It's very ignorant of me. And I ran off. It was like this is very ignorant." (Id., p. 254.)

Petitioner described the contact with the victim as "like a touch and go because I was like freaked out." (Id., p. 255.) When asked why he undertook the attack, Petitioner stated that he was "just messing around" and described financial and work problems that made him angry and put him in a bad mood. (Id., pp. 230, 240-41, 243-44.)  Petitioner told Weekes that he believed he had "a bit of an anger management problem" but that he did not want to hurt anybody. (Id., pp. 231, 258.)

Petitioner claims that his pre-*Miranda* statements were subject to suppression because he was in custody but had not been provided *Miranda* warnings. He also claims that his statements were

---

[2] The tapes were played for the jury, but the transcript of Petitioner's second trial did not include the content of the tapes. (Dkt. 13, Ex. 2, Vol. X, pp. 227, 235.)  Therefore, the postconviction court relied on the transcript of Petitioner's first trial for this information. (Dkt. 13, Ex. 5, Vol. III, Final Order Denying Defendant's Motion for Postconviction Relief, p. 5.)

involuntary because they were obtained through Weekes' misrepresentation of the evidence and promises of leniency if he cooperated.  Petitioner asserts that a motion to suppress would have been granted and that "[w]ithout these inculpatory statements, all other 'evidence' against Mr. Conner is circumstantial and the jury would not have found Mr. Conner guilty."  (Dkt. 2, p. 12.)

The state court summarily rejected Petitioner's claim that counsel was ineffective for failing to move to suppress his statements.  Upon undertaking a thorough examination of counsel's performance, the state court determined that counsel did not act deficiently in failing to file a motion to suppress because the motion would have been without merit.  (Dkt. 13, Ex. 5, Vol. III, Final Order Denying Defendant's Motion for Postconviction Relief, pp. 3-8.)  The state court also thoroughly analyzed the claim under *Strickland*'s prejudice prong and determined that relief was not warranted:

> Moreover, aside from failing to demonstrate that counsel's performance was deficient, the Defendant has also failed to demonstrate that he was prejudiced by counsel's not filing a motion to suppress.  At trial, ample evidence was presented to convict the Defendant of the charge.  The victim identified the Defendant's van as the same van the man who attacked her was in.  *Exhibit H, p. 88*.  The victim testified that the Defendant was wearing clothing that matched what the Defendant told the police he was wearing on the date in question.  *Exhibit H, pp. 82, 207*.  The Pritchetts both testified that they saw the same van turn around by the bus stop the attack occurred at then speed away.  *Exhibit H, p. 98, 101-02, 112-14*. [P.M.] testified that the same day she saw the brown van at the high school between 11:30 am and 12:00 pm and that the driver had a stocking over his head.  *Exhibit H*, p. 147-48. [I.M.]testified at the first trial, and this testimony was properly read to the jury as she had passed away prior to the second trial.   [I.M.]'s testimony was that on the same date, at 3:00 pm, she saw the van pull up behind her on her way home from school. *Exhibit H, p. 153*.  The driver got out, wearing a stocking over his head, and started running after  [I.M.], who was able to escape.  *Exhibit H, p. 153-54*. [J.H.]testified that two days before the attack on the victim, she witnessed the Defendant driving around the track as she walked around it.  *Exhibit H, p. 159*.  [J.H.]stated the Defendant was driving the van at the pace she was walking and was staring at her. *Exhibit H, p. 160*.  [J.H.]further identified the Defendant in court as the same man that was driving the van on February 14, 2000 [sic].  *Exhibit H, p. 161-64*.  Dale Setter, the school security guard, testified that he also witnessed the van, and wrote down the plate number which Deputy Chucciara determined was registered to the

Defendant's van.  *Exhibit H, p. 168, 176-80*.  On February 17, 1999, given information by the school, Sergeant O'Connor went to Defendant's house, where [s]he observed a van matching the description of all above witnesses, which the Defendant confirmed he owned.  *Exhibit H, pp. 186-88*.  The Defendant consented to a search of the van and his house, where Sergeant O'Connor found a pair of suntan colored pantyhose with the crotch ripped out.  *Exhibit H, pp. 191-94*.  These were introduced into evidence at trial.  *Exhibit H, pp. 193-94*.  Additionally, Sergeant O'Connor spoke to the Defendant who told [her] that he was working with his uncle during the time of the attacks, and that his uncle had even commented that he met the description of the attacker.  *Exhibit H, pp. 195-199*.  Sergeant O'Connor testified [s]he knew the defendant was lying because no information regarding the description of the assailant was released to the public.  *Exhibit H, pp. 199-200*.

In summary, testimony from multiple witnesses would have established the events of the attack, the fact that the Defendant owned the van in question, that the van was found speeding away from the scene of the attack, that the Defendant stopped the van and ran after [I.M.] later that same day, that the Defendant's van was seen by [P.M.] the same day driving around the school with stockings over his head, that the Defendant was seen by [J.H.]two days earlier driving around the track following her, that pantyhose were found in the Defendant's house, and that the Defendant provided statements to Sergeant O'Connor that indicated he was lying.  Therefore, in light of the above evidence, assuming arguendo that there was a basis to file a motion to suppress; it is dubious that the outcome of the trial would have been different.  Consequently, the Defendant cannot satisfy the *Strickland* prejudice prong and Ground One is denied.

(Dkt. 13, Ex. 5, Vol. III, Final Order Denying Defendant's Motion for Postconviction Relief, pp. 8-10.)  Ground One can be resolved by applying *Strickland*'s prejudice prong.  Even assuming that counsel successfully moved to suppress Petitioner's recorded statements to Weekes, Petitioner has not demonstrated a reasonable probability that the outcome of the proceedings would have been different.[3]  Petitioner did not contest at trial that he was the person who attacked the victim.  In

---

[3] To establish attempted first degree murder, the State was required to prove beyond a reasonable doubt that (1) Petitioner did some act intended to cause the death of the victim that went beyond just thinking or talking about it; (2) Petitioner acted with a premeditated design to kill the victim; and (3) the act would have resulted in the death of the victim except someone prevented Petitioner from killing her, or he failed to do so.  (Dkt. 13, Ex. 2, Vol. X, p. 328.)  Fla. Std. Jury Inst. (Crim.) 6.2; §§ 782.04(1)(a), 777.04, Fla. Stat.  To establish false imprisonment, the State was required to prove beyond a reasonable doubt that Petitioner (1) forcibly confined, abducted, imprisoned, or restrained the victim against her will; and (2) had no lawful authority.  (Dkt. 13, Ex. 2, Vol. X,  pp. 334-35.) Fla. Std. Jury Inst. (Crim.) 9.2; § 787.02, Fla. Stat.

addition to the evidence set forth in detail by the postconviction court,[4] the jury heard the victim's detailed account of the attack itself, in which she described the perpetrator as being on top of her so that she could not get up and choking her so that she could not breathe or scream.  (Dkt. 13, Ex. 2, Vol. IX, pp. 66-72, 85.)  Furthermore, as the state court noted, Petitioner's initial statement to Sergeant O'Connor on February 17, 1999, the admissibility of which he does not challenge, reflects that he knew information concerning the description of the attacker that had not been made public.  O'Connor testified that Petitioner told her his step uncle said that Petitioner kind of matched the description of the suspect as a young man with long, brown hair.  (Dkt. 13, Ex. 2, Vol. X, p. 199.)  O'Connor testified that the suspect's description had not been publicly released.  (Id., p. 200.)

In addition, the recorded statements that Petitioner argues counsel should have moved to suppress did not include any statements indicating he intended to kill the victim, admitting that he choked the victim, or admitting to any form of restraint, abduction, imprisonment, or confinement of the victim.  (Dkt. 13, Ex. 5, Vol. III, Final Order Denying Defendant's Motion for Postconviction Relief, Ex. I.)[5]  Accordingly, even if the challenged statements had been excluded from trial, Petitioner fails to show a reasonable probability that the outcome of the proceedings would have been different given the evidence of his guilt.  As Petitioner does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying relief,  he does not

---

[4] As the state court noted, the victim described the attacker as wearing clothing consistent with clothes Petitioner later admitted to police he was wearing.  The record reflects that Sergeant O'Connor met with Petitioner a second time at the police station on February 18, 1999, after Weekes interviewed Petitioner, and that Petitioner made statements about his clothes during this second meeting with O'Connor.  (Dkt. 13, Ex. 2, Vol. X, pp. 203-04, 206-07.)  These remarks were not included in the transcript of recorded statements to Weekes that Petitioner alleges counsel should have moved to suppress.  (Dkt. 13, Ex. 5, Vol. III, Final Order Denying Defendant's Motion for Postconviction Relief, Exhibit I.)  Petitioner does not allege that counsel should have moved to suppress his statements to O'Connor regarding his clothes.

[5] During his closing argument, defense counsel relied heavily on Petitioner's recorded statements in arguing to the jury that Petitioner was only guilty of aggravated battery because he lacked the premeditated intent necessary to convict him of attempted first degree murder.

show entitlement to relief on Ground One.

**Ground Two**

Petitioner asserts that counsel was ineffective for failing perform pre-trial discovery and to depose and call as witnesses Deputy Allison and Deputy Weigand. Witnesses testified at trial that the victim's neck was red after the attack. Petitioner states that the deputies' reports show that Allison did not observe any red marks on the victim's neck after the attack, and that Weigand did not see any bruises or marks on the victim's neck when she photographed the victim on February 25, 1999.[6] Petitioner asserts that, had counsel conducted a proper pre-trial investigation regarding these potential witnesses, "a compelling argument could have been made that the charge of attempted first-degree murder was not supported by the facts and a more favorable outcome would have likely occurred." (Dkt. 2, p. 16.) The state court denied this claim:

> **Deputy Allison:** The Defendant claims that Counsel should have investigated and deposed Deputy Allison, and called him as a witness at trial to elicit testimony about whether or not Deputy Allison observed marks on the victim's neck immediately after the victim reported the attack to the police. During the trial, Donald Pritchett, Diane Pritchett, Julie McDonald, and Michael McDonald all testified that the victim's neck was red when they first saw her after the attack. *Exhibit H, pp. 106, 117, 125, 135.* However, Deputy Allison's police report said that the victim did not have any marks on her neck.
>
> As the defendant filed the same claim in regard to his original 2000 trial, the Court finds that the Defendant was already aware of Deputy Allison's report. The Defendant does not provide any information in his claim that a deposition of Deputy Allison would reveal any additional information that was previously unknown to the Defendant or to counsel. In order to show prejudice from the failure to depose a witness, the defendant must demonstrate what unknown information would have been revealed by a deposition. *Davis v. State*, 928 So.2d 1089, 1117 (Fla. 2005) (holding that Davis failed to show prejudice from counsel's decision not to depose

---

[6] Petitioner attached to his postconviction motion a report made by Deputy Allison dated February 16, 1999. It provides that Allison responded to the location of the attack and that Allison "did not observe any marks on [the victim's] neck." (Dkt. 13, Ex. 5, Vol. I, Motion For Postconviction Relief, Ex. C.) Petitioner also attached Deputy Weigand's report providing that she photographed the victim on February 25, 1999. Weigand observed bruises or marks on the victim's shoulder, thigh, and knee, but the report makes no mention of the victim's neck. (Id., Ex. D.)

. . . certain people where Davis failed to show that any depositions would have revealed information unknown to counsel.)  Therefore, Defendant fails to show prejudice in counsel's decision not to depose Deputy Allison.

In regard to Defendant's allegation that counsel should have called Deputy Allison as a witness, the Court finds that the omission of the testimony did not prejudice the outcome of the trial.  During his conversations with law enforcement, the Defendant confessed to running after the victim with pantyhose over his head and putting his hands on her shoulders while she was on the ground.  *Exhibit H, pp. 250-55*.  Multiple witnesses allege that the victim had other injuries.  *Exhibit H, pp. 106, 117, 125, 135*.  Additionally, as discussed above there was substantial evidence from several other witnesses linking the Defendant to the crime.  Given the amount of evidence, the Court finds it incredulous that testimony from Deputy Allison that he did not observe actual marks on the victim's neck would change the outcome of the case.  Therefore, the Defendant has failed to show prejudice, and this claim is denied.

**Deputy Weigland:**[7] The Defendant raises the same claim with regard to Deputy Weigland.  Specifically, he alleges that counsel was ineffective for failing to depose and call Deputy Weigland as a witness.  The Defendant references a report that Deputy Weigland wrote after taking photographs of the victim ten days after the attack, detailing the noticeable injuries on the victim.  The Defendant claims that the report was significant as it does not mention any bruising or injury to the neck.

The Court finds that it is highly unlikely that this would have changed the outcome at trial.  First of all, the photographs were taken ten days after the attack, therefore the Court finds that the injuries noted by Deputy Weigland are not an accurate representation of the victim after the attack, and would not have discredited the witnesses' testimony at trial.  Moreover, while several witnesses testified that the Defendant's [sic] neck was red, there was no testimony that there was bruising or ligature marks on the victim's neck.  Based on what the Defendant claims Deputy Weigland's testimony would have revealed, the Court concludes that the failure of counsel to depose or call Deputy Weigland as a witness did not prejudice the Defendant's trial.

Moreover, the Defendant does not allege that deposing Deputy Weigland would have revealed any new information to the Defendant or to counsel.  Deputy Weigland's role in the case was limited to photographing the victim ten days after the attack.  Therefore, Deputy Weigland could not testify to how the victim received injuries or how long she had them.  The Court finds that the Defendant fails to establish how the failure to depose Deputy Weigland prejudiced the case.  Ground Two is denied.

(Dkt. 13, Ex. 5, Vol. III, Final Order Denying Defendant's Motion For Postconviction Relief, pp. 10-

11).  Petitioner does not show prejudice as a result of counsel's performance.  First, as the state court

---

[7] This name appears in the state court record as both Weigand and Weigland.

noted, Petitioner does not establish that any information concerning the deputies' observations of the victim would have been uncovered as a result of deposing them because their reports were in existence prior to his first trial.  Petitioner does not identify what other information would have been learned through depositions.

Additionally, witnesses who saw the victim after she was attacked testified that her neck was red.  (Dkt. 13, Ex. 2, Vol. IX, pp. 100, 118, 128-29.)  The victim also testified that her neck was red.  (Id., p. 68.)   To the extent the deputies' testimony would have contradicted these witnesses' statements, Petitioner fails to show a reasonable probability of a different outcome at trial in light of the State's evidence, including the victim's description of the attack in which she stated she was choked with a stocking that had been placed around her neck.  Additionally, Petitioner does not demonstrate that the State must provide evidence of physical injury or contact to prove attempted first degree murder under Florida law.  *See* §§ 782.04(1)(a), 777.04(1) Fla. Stat.  Therefore, he fails to show prejudice as a result of counsel's failure to conduct pre-trial investigation with respect to the deputies, to depose them, or to call them as witnesses.  Petitioner does not demonstrate that the state court unreasonably applied *Strickland* or unreasonably determined the facts in rejecting this claim. Ground Two warrants no relief.

**Ground Three**

Petitioner contends that counsel was ineffective for failing to object to the introduction of altered evidence at trial.  A pair of pantyhose found during a search of his residence was introduced into evidence.  Petitioner claims that the pantyhose taken from his house did not have knots tied in

Page 14 of  26

them, but the pantyhose introduced at trial did.[8]  He asserts, "[i]t is obvious that these knots were

added after the evidence was seized and after Mr. Conner's first trial.  This had the effect of turning

a normal pair of pantyhose into the deadly weapon needed to support the State's allegations of

attempted murder by means of strangulation, since no such pantyhose was ever found."  (Dkt. 2, p.

20.)  He argues that the knotted pantyhose "prejudicially misled the jury to believe that the pantyhose

were found and seized with knots tied into one leg and Mr. Conner premeditatedly tied them there

to facilitate the strangling of the victim, when in fact no such knots existed."  (Id.)  He further claims

that counsel's failure to object meant that the claim was not preserved for appeal.  The state court

summarily denied this claim:

> Defendant claims that Counsel was ineffective for failing to object to the
> introduction of altered evidence into the record.  Specifically, Defendant alleges that
> the pantyhose that were introduced were altered between when they were seized from
> his house and when they were presented at trial.  Defendant contends that the
> pantyhose that were taken from his house did not have any knots tied in them.
> Furthermore, he claims that the transcripts from his first trial reflect that there were
> no knots in the pantyhose.  At this trial, the same pantyhose were presented with a
> knot in them.  Defendant argues that Counsel's failure to object to the introduction
> of the altered pantyhose prejudicially misled the jury "to believe that the pantyhose
> were found and seized with knots tied into one leg and that the defendant
> premeditatedly [sic] tied them there to facilitate the strangling of the victim, when in
> fact no such knots existed."  The Defendant claims that Counsel knew that the
> evidence was altered, and attached a letter from Counsel explaining how to handle
> this issue in a postconviction motion.  Defendant alleges that had Counsel objected
> to the introduction of the altered evidence, it would not have been admitted and there
> would have been reasonable doubt in the minds of the jury.
>
> It is clear from the sworn testimony of both Sergeant O'Connor and Deputy
> Clegg that the pantyhose introduced at trial were the same pantyhose that were seized
> from the Defendant's residence on February 17, 1999.  *Exhibit H, pp. 183, 187-89,
> 193-94.*  Sergeant O'Connor testified that the pantyhose were in the same condition
> and that there was a hole in the crotch of the pantyhose.  *Exhibit H, pp. 193-94.*

---

[8] Petitioner attached to his postconviction motion a portion of the victim's deposition in which she stated that the stocking used to strangle her had knots tied in both ends.  (Dkt. 13, Ex. 5, Motion For Postconviction Relief, Ex. H, p. 16.)  He further claims that "there is sworn testimony from Mr. Conner's first trial that clearly states that there were not any knots tied into the leg of the alleged pantyhose."  (Dkt. 2, p. 18.)

Therefore, the record refutes the Defendant's claim that the pantyhose introduced at trial were different pantyhose or had been altered, and the claim is denied.  Fla. R. Crim. P. 3.850(d).

Moreover, assuming arguendo that knots had been added to the pantyhose, the Court finds it dubious that it would have changed the verdict at trial.  As previously discussed in Ground One (B), the State presented a substantial amount of incriminating evidence.  The Defendant claims that the knots turned the pantyhose into a deadly weapon.  However, in light of all of the evidence provided by the State, the Court finds it hard to believe that had unknotted pantyhose been introduced, the verdict would have been any different.  The victim provided no testimony that the pantyhose used to strangle her had any knots in them.  *Exhibit H, p. 70*.  Additionally, the State never made any argument that the Defendant had tied knots in the pantyhose in an act of premeditation.  Given the amount of evidence produced and the fact that it was never argued that the knots transformed the pantyhose into a deadlier weapon, the Court concludes that the existence of knots in the pantyhose would not have changed the verdict

To any extent in which the Defendant is arguing that counsel should have objected to the admission to preserve the record for appeal, this is not a cognizant claim for a postconviction motion filed pursuant to rule 3.850.  The affect the lack of objection has on the appeal does not rise to the level of ineffective assistance of trial counsel.  *See Strobridge v. State*, 1 So.3d 1240, 1242 (Fla. 4th DCA 2009).  Therefore, this claim is denied.

(Dkt. 13, Ex. 5, Vol. III, Final Order Denying Defendant's Motion For Postconviction Relief, pp. 12-

13).  Even if the pantyhose introduced at trial had knots, as the state court found, Petitioner has not

established prejudice under *Strickland*.  Even assuming counsel successfully objected to the

introduction of the pantyhose and it was excluded from evidence, Petitioner fails to show a

reasonable probability that the outcome of the proceedings would have been different.  First, the

State did not argue to the jury regarding any knots in the pantyhose, or allege that such knots were

relevant to a premeditated intent to kill.  (Dkt. 13, Ex. 2, Vol. IX, pp. 31-47; Vol. X, pp. 302-25.)

Additionally, in light of the State's evidence of guilt, including the victim's specific testimony that

she was choked with a stocking, Petitioner fails to establish a reasonable probability that the absence

of this physical evidence at the trial would have changed the outcome of the proceedings.[9]

Therefore, Petitioner does not show that the state court's rejection of his claim was an unreasonable

application of *Strickland* or was based on an unreasonable determination of the facts.   He is not

entitled to relief on Ground Three.

**Ground Four**

Petitioner argues that counsel was ineffective for not objecting to the victim's testimony that

she thought she heard a loud noise that caused Petitioner to run back to his van during the attack.

He claims that the State used this testimony to establish that his abandonment of the attempted

murder was involuntary.   Evidence introduced at trial reflects that the van belonging to the Pritchetts,

who drove upon the scene immediately after the attack, was noisy due to a broken or missing

muffler.   Petitioner claims that "the victim's testimony as to the fact that she 'thought' she heard a

loud noise is tantamount to speculation, therefore, counsel should have objected."   (Dkt. 2, p. 23.)

The state court summarily denied this ground when Petitioner raised it in his postconviction

motion:

> Defendant claims that Counsel was ineffective for failing to object to the victim's testimony that she thought she heard a loud noise that caused the Defendant to get up and run back to his van.   Defendant claims that this testimony was objectionable speculation.
>
> After reviewing the trial transcript, the victim's testimony that she thought she heard a loud noise was based on her personal experience.   *Exhibit H: Trial Transcript, p. 72.*   Witnesses are permitted to recount past events that they have personal knowledge of while testifying at trial.   § 90.801(1)(c), Fla. Stat.   Moreover, the witness did indicate that she *thought* she heard a loud noise, leaving the jury to determine whether or not there was a loud noise.   *Kennard v. State*, 42 Fla. 581 (1900) (Where a witness has knowledge of the facts he may speak from a recollection of the facts as they actually appeared to him, and even if the impression is not a

---

[9] Since he fails to show any error in the proceedings, Petitioner does not establish that counsel was ineffective to the extent his lack of an objection resulted in a failure to preserve issues for appeal.   *See United States v. Winfield*, 960 F.2d 970, 974 (11th Cir.1992) (counsel is not ineffective for failing to preserve or argue meritless issues).

positive assurance, the jury may consider it.)  The use of the word "thought" does not make the witness' statement objectionable speculation.  *Henderson v. State*, 94 Fla. 318 (1927) (The law does not preclude a witness from prefacing statements with qualifying words.)   The Court finds that Counsel acted appropriately, as the testimony was not objectionable.  Accordingly, this claim is denied.

(Dkt. 13, Ex. 5, Vol. III, Order Denying Defendant's Motion For Postconviction Relief In Part;

Directing State To Respond In Part; Reserving Ruling In Part, p. 5.)  The record supports the state

court's decision. The victim testified:

> Q      Okay.  And let me ask you, can you tell this jury what happened now after the stocking has been wrapped around your neck and you have lost your breath for five to six seconds, and you're fighting, you can't get up, and he's choking you.  What happens after that?
>
> A      He was choking me, and I thought I heard a van.  I'm sorry, a van.  I thought I heard a loud noise.  And he got up and he just ran back to his van laughing.
>
> Q      Okay.  And did you recognize the sound of this loud noise?
>
> A      Not at the time.  I just heard a noise.
>
> Q      Okay.  So he gets into the van and just drives off after you hear this loud noise, right?
>
> A      Yes.

(Dkt. 13, Ex. 2, Vol. IX, p. 72.)  The victim's testimony continued:

> Q      Okay.  And now, we were talking about that loud noise that you heard, right?
>
> A      Yes.
>
> Q      Did you, after the fact, after this incident, in the next couple of days, did you figure out what that noise was?
>
> A      Yes.
>
> Q      And what was it?
>
> A      It was the muffler on the back of the Pritchetts' van.

Q      Okay.  Now, after this individual goes and he gets in his van and he drives off, right?

A      Yes.

(Id., pp. 76-77.)

The victim did not testify that she thought she heard a noise that in fact caused Petitioner to return to his van.  Moreover, the record indicates that the victim did hear a noise, and supports the state court's conclusion that her testimony was based upon her personal experience.  Furthermore, whether the victim's testimony was impermissibly speculative involves a question of Florida evidentiary law.  Deference must be afforded to the state court's decision on federal habeas review. *See Will v. Sec'y, Dep't of Corr.*, 278 Fed. App'x 902, 908 (11th Cir. 2008) ("Although an ineffective-assistance-of-counsel claim is a *federal* constitutional claim, which we consider in light of the clearly established rules of *Strickland*, when 'the validity of the claim that [counsel] failed to assert is clearly a question of *state* law, . . . we must defer to the state's construction of its own law.'") (citing *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984)); *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005) ("The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done. . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)).

Petitioner fails to establish that the state court's decision was an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts.  Accordingly, he is not entitled to relief on Ground Four.

**Ground Five**

Petitioner claims that counsel was ineffective for not objecting during closing arguments when the prosecutor made a statement that concerned Petitioner's silence at trial, was based on the prosecutor's personal belief, and was not supported by the evidence introduced at trial.  The state court denied this ground when Petitioner raised it in his postconviction motion:

> Defendant claims that Counsel was ineffective for failing to object to the State's closing argument.  Specifically, Defendant alleges that the State improperly commented on Defendant's failure to testify at trial.  The comment in question is, "But what's going through the Defendant's head that entire time?  He didn't tell you... He can think, one thousand.  I'm going to kill this girl.  Two one thousand. I'm going to kill this girl.  Three one thousand.  I'm going to pull tighter and kill this girl.  Four one thousand.  She's trying to scream.  She can't.  She's out of breath. Five one thousand.  Six one thousand. That's what's going through his head, that's how we know he intends to kill her." *Exhibit H, p. 308.*
>
> Defendant contends that none of the evidence at trial included his thoughts at the moment before the crime occurred.  In fact, Defendant alleges that all of the recorded statements that were played at trial stated that Defendant never intended to hurt anyone.  Therefore, Defendant concludes that the State's closing remarks were based only on personal belief and not on the facts in evidence, and were therefore an improper comment on Defendant's refusal to testify.  The Defendant claims that his attorney was ineffective for failing to object and preserve the issue for appeal.
>
> When evaluating a prosecutor's remarks during closing arguments, the remarks must be considered within the context of the entire record.  *Rivera v. State*, 840 So.2d 284, 287.   Therefore, a comment that considered alone would be inappropriate may be an appropriate comment when considered in context.  *Id.*
>
> In this case, counsel's theory of the case was that the Defendant was only guilty of aggravated battery of the victim, not attempted murder and kidnapping. *Exhibit H, pp. 299-302*, 350.  To that end, Counsel argued during closing arguments that Defendant lacked the premeditated intent to murder the victim and that Defendant was innocent of the kidnapping charge.  *Exhibit H, p. 276-302*.  As such, the State's comment was in rebuttal to counsel's argument that the Defendant did not intend to kill the victim, and therefore could not be guilty of attempted murder. *Exhibit H, p. 291-93*.  Accordingly, trial counsel cannot be found ineffective for failing to object to the State's rebuttal argument.  *See Evans v. State*, 995 So.2d 933, 948 (Fla. 2008) (holding counsel cannot be deemed ineffective for failing to object to prosecutor's comments during closing which are proper rebuttal to defense counsel's closing arguments).  As the State made no improper arguments, Counsel cannot be found to be ineffective for failing to raise a meritless objection.  *Gonzalez v. State*, 990 So.2d 1017, 1025 (Where prosecutor's comments were proper, counsel cannot be found to be ineffective for failing to object.) . . . Therefore, this claim is denied.

(Dkt. 13, Ex. 5, Vol. III, Final Order Denying Defendant's Motion For Postconviction Relief, pp. 13-14).   A prosecutor may not comment on a defendant's failure to testify in his defense.   *Griffin v. California*, 380 U.S. 609, 615 (1965) ("[T]he Fifth Amendment . . . in its bearing on the States by reason of the Fourteenth Amendment, forbids . . . comment by the prosecution on the accused's silence."); *United States v. Bright*, 630 F.2d 804, 825 (5th Cir. 1980) ("It is settled law that the government may not comment on a defendant's failure to testify, either directly or indirectly.") (citations omitted).   "However, not every statement that under some conceivable interpretation might draw attention to a defendant's decision not to testify is a comment on silence."   *United States v. Berkowitz*, 662 F.2d 1127, 1136 (5th Cir. 1981) (Unit B).    To establish that the prosecutor's comment about his silence is improper, a defendant must show "(1) the prosecutor manifestly intended to comment on the defendant's silence, or (2) the character of the comment was such that a jury would naturally and necessarily construe it as a comment on the defendant's silence."   *United States v. Stuart-Caballero*, 686 F.2d 890, 892 (11th Cir. 1982).

Prosecutors are also prohibited from stating their personal beliefs.   "During a trial, counsel have a duty to refrain from commenting on their personal views on a defendant's guilt and the evidence."   *United States v. Bernal-Benitez*, 594 F.3d 1303, 1315 (11th Cir. 2010) (quoting *Parker v. Allen*, 565 F.3d 1258, 1273 (11th Cir. 2009)).   Additionally, "[a] prosecutor 'may not suggest that evidence which was not presented at trial provides additional grounds for finding defendant guilty.'"   *United States v. Johnson*, 713 F.2d 633, 651 (11th Cir. 1983) (quoting *United States v. Garza*, 608 F.2d 659, 663 (5th Cir. 1979)).

"[A] prosecutor's statements during closing argument require reversal only 'if the comments are both improper and prejudicial to a substantial right of the defendant.'"   *United States v. Jacoby*,

955 F.2d 1527, 1541 (11th Cir. 1992) (quoting *United States v. Rodriguez-Suarez*, 856 F.2d 135, 139

(11th Cir. 1988)).  Furthermore, "claims of prosecutorial misconduct are fact specific inquiries which

must be conducted against the backdrop of the entire record."  *United States v. Hall*, 47 F.3d 1091,

1098 (11th Cir. 1995).  *Accord United States v. Young*, 470 U.S. 1, 11 (1985) ("[A] criminal

conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone,

for the statements or conduct must be viewed in context; only by so doing can it be determined

whether the prosecutor's conduct affected the fairness of the trial.").

The record supports the state court's conclusion that counsel was not ineffective for failing

to object to the prosecutor's rebuttal argument.  In his closing argument, counsel repeatedly argued

that the State could not show the intent necessary to convict Petitioner of attempted first degree

murder because nobody, including Petitioner,  knew why Petitioner took the actions that he did.

Counsel also argued that five to six seconds was not long enough to form premeditation, and counted

out a period of six seconds in an attempt to illustrate this point.  Defense counsel's closing argument

included the following:

> Finally, the State may argue that the choking of [the victim] with a piece of pantyhose for five or six seconds in somehow proved beyond a reasonable doubt of attempt to commit premeditated first-degree murder.  All right.
>
> But let's check that theory out.  All right.  Five to six seconds.  One thousand one, one thousand two, one thousand three, one thousand four, one thousand five, one thousand six.  Stop.  That's the length of time that is being complained of here.
>
> He stops.  He jumps up.  He runs away, laughing to his van, scared by what he did.  That is not sufficient time to allege that he had the intent to commit murder, just based on his act alone.
>
> Aggravated battery, you have that.  Attempted murder, no.  Yes, she was frightened.  Yes, she couldn't breathe.  But Mr. Conner starting to choke someone for five to six seconds and realizing he needed the horror of what he was [sic] doing, so that he jumped up and run away is not proved beyond a reasonable doubt of an attempt to commit premeditated murder.
>
> . . .
>
> The issue is not what was going on in her mind.  The issue is what is going

on in Mr. Conner's mind.  What is his intent?

(Dkt. 13, Ex. 2, Vol. X, pp. 286-87.)

   You heard how he didn't understand why he did what he did.  You heard him say he didn't hurt somebody.  He didn't even know.
       I submit that's enough to understand what his intent really was that day.  He didn't know what it was.

(Id., p. 291.)

       Mr. Conner does not have a good reason for doing what he did, he told Detective Weekes.  But he did say, and he told us, that he did not understand what he did but it was not with the intent to hurt anybody.
       Now, that brings us to this question.  If Mr. Conner himself does not know what his intent was that day, then who are we to sit around and second guess him and say, well, Mr. Conner, don't you know, you intended to commit murder.  For the State to insist that murder was his intent is to make evidence out of thin air.

(Id., pp. 291-92.)

       So I submit to you that Mr. Conner was telling Detective Weekes the truth and is telling us the truth when he says that he attacked [the victim] but didn't have any idea what he intended to do.  He calls his own actions stupid, ignorant, and said he didn't know why he did it.  Detective Weekes asked Mr. Conner, why did you do that.  And Mr. Conner answered, just messing around.  I wasn't making light of it.  But that's what the situation was.
       We know what happened.  Mr. Conner got angry at something or somebody spontaneously, and without any thought about it, took it out on a young stranger.

(Id., p. 293.)

       Mr. Conner told Detective Weekes when he did this he got scared, asked himself, what am I doing.  And he fled the scene.  Mr. Conner told Detective Weekes he didn't know why he did this except that he was upset.  The two of them talked about it.
       Mr. Conner felt he had some problems and needed an anger management counseling.  Detective Weekes asked Mr. Conner, why did you do that.  And he answered, just messing around.  When trying to find out why he did this, Detective Weekes asked him no reason internal.  And he said, I don't know.  It's just really messed up.  It's just he way things have been going in my life.  I didn't want to hurt anybody.  I was in a really bad mood and decided to mess with somebody.

(Id., pp. 296-97.)

>The point is that Mr. Conner himself does not know why he did this.  He was looking for a reason, the reasons don't make any sense.  Mr. Conner didn't have any intent and had no idea what he was trying to do.

(Id., pp. 297-98.)

>So I'm asking you to give us a verdict that speaks the truth.  Give us a verdict that says to Mr. Conner . . . those were dumb reasons for doing what you did.  You don't know why you did what you did.  And, frankly, neither do we.  And since nobody, including you, knows why you did what you did, we can't say beyond a reasonable doubt that you committed . . . attempted first-degree murder . . .

(Id., pp. 299-300.)

Petitioner alleges that counsel should have objected to the following prosecutorial comment, made during rebuttal closing argument, as improper:

>But what's going through the defendant's head that entire time?  He didn't tell you.  He can think, one one thousand.  I'm going to kill this girl.  Two one thousand.  I'm going to kill this girl.  Three one thousand.  I'm going to pull tighter and kill this girl.  Four one thousand.  She's trying to scream.  She can't.  She's out of breath.  Five one thousand, six one thousand.  That's what's going through his head.  That's how we know he intends to kill her.

(Id., p. 308.)  "A prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel." *United States v. Stanley*, 495 Fed. App'x 954, 957 (11th Cir. 2012) (citing *United States v. Sarmiento*, 744 F.2d 755, 765 (11th Cir. 1984)).  This principle is recognized in Florida law.  "Based on notions of fundamental fairness, the doctrine of invited response allows the state to comment on the issues raised by the defendant." *Rivera v. State*, 840 So.2d 284, 288 (Fla. 5th DCA 2003).  "The proper limit of a rebuttal is 'a reply to what has been brought out in the defendant's [closing] argument.'" *Brown v. State*, 18 So.3d 1149, 1151 (Fla. 4th DCA 2009) (quoting *Heddendorf v. Joyce*, 178 So.2d 126, 130 (Fla. 2d DCA 1965)).  Furthermore, otherwise improper prosecutorial comments may be permissible when made in reply to matters raised by the defense.  *See United States v. Rogers*, 981 F.2d 497, 499 (11th Cir. 1993) ("The challenged remarks at closing

argument, although probably improper if viewed in isolation, were replies in kind to comments appellant's counsel had made during appellant's opening and closing statements.") (citation omitted).

Taken in context, the prosecutor's rebuttal comments were made in response to the defense argument that Petitioner lacked premeditated intent to kill and could not have formed such intent in six seconds.  The prosecutor responded to Petitioner's assertions by arguing that Petitioner failed to explain what his state of mind was if, as he claimed, he had no premeditated intent to kill, and that Petitioner could have formed premeditation while choking the victim.  Petitioner does not show that, when considered in the context of the proceedings as a whole, the rebuttal comments were improper for the reasons alleged.  Therefore, the failure to object to these comments was not deficient performance.  Petitioner does not establish that the state court unreasonably applied *Strickland* or unreasonably determined the facts in rejecting his claim.[10]  Petitioner is not entitled to relief on Ground Five.

Accordingly, it is

**ORDERED** that Petitioner's petition for writ of habeas corpus (Dkt. 1) is **DENIED**.  The Clerk is directed to enter judgment against Petitioner and to close this case.

It is further **ORDERED** that Petitioner is not entitled to a certificate of appealability.  A petitioner does not have absolute entitlement to appeal a district court's denial of his habeas petition.  28 U.S.C. § 2253(c)(1).  A district court must first issue a certificate of appealability (COA).  *Id*.

---

[10] Furthermore, Petitioner shows no prejudice as a result of the lack of objection.  The jury was instructed that what the attorneys said was not evidence; that Petitioner was presumed innocent; that the State had the burden of proof to overcome this presumption of innocence; that Petitioner was not required to prove anything or present evidence; that Petitioner's silence at trial must not influence the jury in any way or be taken as an admission of guilt; and that the jury must look solely to the evidence introduced during trial for proof of the charges.  (Dkt. 13, Ex. 2, Vol. X, pp. 274, 335, 336, 338.)  *See, e.g., United States v. Herring*, 955 F.2d 703, 710 (11th Cir. 1992) ("[P]rosecutorial misconduct may be rendered harmless by curative instructions to the jury.").  Jurors are presumed to follow their instructions.  *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Brown v. Jones*, 255 F.3d 1273, 1280 (11th Cir. 2001).

"A [COA] may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made this showing. Because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**ORDERED** in Tampa, Florida, on *February* 22 , 2016.

JAMES D. WHITTEMORE
United States District Judge

SA:mh
Copy to:
*Pro se* Petitioner
Counsel of Record

Page 26 of 26